The first case on the docket this morning for oral argument is Ohms v. Stevens. Counsel, whenever you're ready, you may proceed. My voice stayed at home today also. So I apologize for the crankiness, and I will try to push through. You're doing fine. Thank you. I came into this case after the fact and am counsel on appeal. I will be very candid with the court. You can count on one hand the number of family law cases I've tried in my 30 years of practice, 30 years this year. I say that because with respect to a couple of the issues, I have reviewed the record and the law, not just as someone who might be in a very straight line of just doing family law cases, but as someone who has tried cases for 30 years in multiple subject areas. We have multiple issues. One is an evidentiary issue, and I think that observation applies most to it, and that's whether the testimony was artificially limited by not permitting any testimony or evidence past or older than the date of the stipulated agreement, which was August of 2010, even if the purpose for the introduction may have been something permitted under other rules of evidence, such as to show pattern, knowledge, motive, the basis for taking action, that kind of thing. That issue and the risk of harm issue, which are the first two issues of my brief, I believe are the most critical issues before the court, and I'll be candid and tell you that. I believe that the trial court, again, artificially looked to see whether there had already been an infliction of harm and finding none that was patent determined, therefore, that there was no risk. The trial judge is someone I respect greatly. I would let him try any case. He and I worked together at OSAD years ago. I simply think that there were errors in perceiving what the law not only permitted but required in those two issues. The other issue is whether or not there were findings of fact and conclusions of law sufficient to show how he determined the 610 factors, and he did a handwritten order. I believe that he summarily stated, I've considered the factors, but we don't really know how that came out. And I think that's a pretty straightforward argument. Finally, the issue of the Gardner-Madladen report would not have been an issue I raised alone, if that were the only issue before this court, and again, I'm being candid with you. But I think it shows perhaps the frustration in dealing with everything that needed to be presented. This is not indicative, I think, of counsel or of the court, but of the efficiency and economics of trying cases in piecemeal fashion over the course of two months, and we can't avoid that. So, again, I believe that that's not necessarily indicative of anything other than what we are dealing with, with understaffed courts and overcrowded dockets. As to the rest of harm, Appley, in his brief, tries to say that I have miscited case law with respect to various conduct that courts have previously found to be legitimate concerns. No miscitation was intended. Instead, what I intended is to show that every act of concern has, in some appellate court or in our Supreme Court course, been recognized as a legitimate concern. I dare say that we will never find an exact case with exactly the same set in a published case where we can say this is a perfect overlay to what a trial court would find. I do not believe it can be said, notwithstanding the nature of Appley's brief, that any of the factors that were raised in the trial court below were not legitimate concerns of a parent for a child. For example, not having a car. Well, that in and of itself, of course, does not make a parent unworthy or unfit. But there was unrefuted testimony by appellant that, and unobjected to, that at least one physician's appointment was canceled with the appellee calling and saying, the child has a 103 fever, but I can't get him there. I can't drive him and nobody else can drive him either. My paraphrase, if I have misspoken, that's the essence of the communication. So the fact that she had no means by which to get the child care, the fact that she was dependent upon her teenage children who intermittently came through the household for food and toilet paper, the fact that she was dependent on them or others in the public housing complex or Section 8 housing for rides for the child, the fact that she had not taken care of her addictions, and that driving without a license was a pattern of conduct that had begun before August of 2010, there was an effort to introduce evidence of that. And Judge Lewis consistently said, if it's past that point, I can't let it in. I think he sincerely believed that. Appellee cites, too, an opinion by our Justice Harrison. I'm aware of that. I don't believe, however, that that case, or any case, really meant that the deadline in the Act meant that for evidentiary purposes, rules of evidence permitting that which would not come in as direct evidence to be used to prove other things, like mental state, pattern of practice, also cannot go past that date. As respectfully as I can, and again, this is the outsider to family law looking in, if that's what that case means, I don't think that's right. Now, personally, I don't read that case that way. I read the case to say the acts of misconduct, and I'm using that word as a generic, should occur afterwards. But isn't it important that if there is an incident or two incidents, to be able to show that those aren't anecdotal, but instead that they're part of some broader, more dangerous pattern of conduct? As an example, if a person beat a dog in the presence of the child, something that goes against my grain, and the dog were a rottweiler trying to attack the child, that's one thing, that's explained. If it's later learned that that person had beaten the family pets in the presence of the child, and it simply wasn't known as of August, or whenever it was, the original judgment was, wouldn't the pattern of conduct be relevant to show the risk that the child was exposed to irrelevant only after an incident would have occurred after the entry of the original judgment? And that is not the allegation here. I used that as a hypothetical to show that if we were to limit the evidentiary rules by the act, we could be doing an injustice to the efforts to protect children. Brewer says that there is a two-part test. One, to establish that there are current facts that endanger the child. That's where the pattern of conduct would have been relevant if it were permitted. And then the second, once that is shown, is to say that the best interests of the child require a change. I respectfully submit that even with the limitations of evidence, one can find that the appellant met the evidentiary standard as required, the burden of proof. But especially if he had been able to show the pattern of conduct, that would have been done. And so therefore, with respect to that issue, I would request that there be a reversal and remand with instructions to permit the evidence, not of occurrences that by themselves are direct evidence, but to permit the rules of evidence to be borne out by offers of proof as to what pattern of practice, knowledge, intent, or any other appropriate and legitimate evidentiary basis would apply. That's why I say that issues one and two really are tied together, because the limit of the evidence went to the brewer test. The third, and again I'm going in what I think is descending order of importance, is that the judge summarily said he's considered all the six ten factors. We don't have the specific findings of fact and conclusions of law. Now I am not suggesting at all that it should be like when one appears in the Seventh Circuit and they say, where's your stipulated set of facts? Because the Northern District requires it and the Southern District doesn't. But there should be some discussion of the factual basis to make a determination as to why the court decides the six ten factors the way it does. And finally, the guardian ad litem issue, and I don't know what happened there. I wasn't there. The guardian ad litem did not file the report, which was a very substantial, detailed, and narrative report. Did not file it on time. It did not get recorded in the record sheet until after the judge made his ruling. Now had I been an attorney of record, yes, I would have, I hope. But it was filed before Mays. Yes. I would have hoped that I would have filed a motion for extension of time to file my argument saying either I haven't received or I just received ten days late or eight days late the GAO report. That was the killer, the GAO report. Yes. The GAO report was the death knell. Again, I am not trying to be critical of a judge who probably has one of the largest dockets in Williamson County. He has to reach closure on cases. But in this case, with everything that's happened, I believe that what he did was see the GAO report. It's obvious he more or less adopted it. And as humans, once we take our position, it's very difficult to move. Now, there is an argument of waiver in the Apple East brief. The Western surety case, I do not believe, is instructive because that was a summary judgment issue where issues raised in summary judgment may be deemed waived. I agree with that. How do you waive something that occurred outside your presence? And here, the judge, he had the GAO report in hand. He had the file. He didn't have either attorney arguments. And I don't say it critically. They were apparently assuming they had so many days after the GAO report, but nobody had communicated that assumption to the judge. I don't believe that's waiver. It may be poor practice. In conclusion, I believe your honors can see that this has been quite the acrimonious case. All the attorneys who've gone through there, and now me. I am trying to approach this not from one who spends 90% of their time doing family law. Quite the contrary. I'm trying to approach it as a tactician looking at it and saying there were rules of evidence and general common sense procedures that may well have led to a different conclusion and that the appellant, and more importantly, the minor child, deserves to have that opportunity. No questions. Thank you. Thank you. May it please the court. This case is about a mother who's had the primary spasticity of this child for the time of this trial, seven and a half years. This is a case that the father, the appellant, gave custody, sold custody of this mother on August 25th, 2010. At the time of this trial, he says, oh no, I didn't do it in the child's best interest, but he was corrected in his deposition. He said, oh yes, I did give custody to my client, the mother, because it was in the child's best interest. I think that's the scope of this case that really puts things in perspective. As this court is well aware, the burden on this case is that, which I do, at least 50% of custody cases, custody is a matter of arrest within the sound discretion of the trial court and may not be reversed unless it's contrary to the manifest weight of the evidence. You know, I was in this three-day trial, and I think the judge did a very good job of trying to get it heard within a month and a half. We did a couple days in June, July 11th, I think in a month, actually. For that heavy docket, he was very cognizant of that effort. I think he did a very good job of that. What we have here is this, though. We had some issues raised at trial that were different than the pleadings. So we started the trial with a set of pleadings, and then the next day he wants to amend the pleadings and add new assertions. Well, the problem is, these were issues that were discussed about for two and a half, three months ago in deposition. He had an opportunity to amend his pleadings. He didn't, and I think that was part of what the judge's cognizance of it was that at the same time, although these aren't actually new issues that Green brought up, these are issues that, as a custody case, we have a right to come in and prepare our case and be prepared for what we're going to cover. So I think we've got a pleadings issue that the appellant really hasn't addressed. The second issue is this. If you really look at the testimony, the court allowed testimony of a DUI in 2004. The judge allowed testimony that she has not corrected that situation in order to get her driver's license back. So the court was cognizant of those issues, and I think, quite frankly, when you look at the record, allowed a lot of that testimony in. I think this court, you know, many trial courts don't allow a petition to be followed for two years unless it is very egregious. This court allowed that petition. This court was very aware of Brewer and allowed the petition to be heard and filed and have this date in court. And I think that's very important. The concept of this trial court was, which I respectfully disagree, but he allowed this case to be filed within two years and to proceed. So this court is well aware of Brewer, and there is no, that I can see, any rulings of the court, anything in the record that shows that somehow he was misapplying the risk of harm versus actual harm in all due respect. I've never, I've not seen a specific site, I hear the arguments, but I don't see a specific site of what the judge said or in a particular case law. In fact, the GL report refers to Brewer in her report and talks about the two prompt tests. So I think that Judge Lewis is very familiar with the Brewer standard in the test and applied it so. So I don't think there is any evidentiary issue whatsoever in all due respect. But you know, I also think, you know, when he did these custody cases, he said, you know, let's, in fact, what he said is, let's try and keep it to things since August 25th, 2010. Even though he allowed some discretion, he allowed counsel to develop his case a little bit. The problem we become is this. How far back do we want to go? Does the court really want to hear testimony from us on why he wasn't there at the hospital on the birth of his child? I don't think so. Okay, I think the court gave, was very broad in its discretion to allow counsel to develop a case. But at the same time, we're not going to go back seven years now. We're not going to go back and relitigate this case. I mean, counsel would say, well, we didn't. Really, anything can come in. And I'm familiar with the Fifth District's rule. I think Chapman, you know, when it's an agreed to order, you can allow someone to do that. I think the court didn't know that. I think he did that. But more importantly, he admitted in deposition, I believe it was in the child's best interest, in the transcript of his trial. Yes, I believe it was in the child's best interest on August 25, 2010, to give sole custody to my client. Those issues that were raised about his driver's license, that's nothing new. She didn't have a driver's license prior to August 25, 2010. So some of these issues that, in all due respect, the appellant's raising, it was the same condition prior to the judgment. He knew about it, and he still thought it was in the child's best interest. And there's comments about that from the trial court. When the trial court attorney kept trying to bring this up, he said, well, those are issues that were before, and he allowed her to have custody. So your point, Counselor, is okay. So I think, but I think the judge handled it very well. And I think he was actually liberal when he brought up that testimony. As far as the GAO report, you know, trial court, as we know, I mean, the GAO made it clear. I'm going to file my report after I hear all the testimony. If the trial attorney had an objection to that or wanted that report filed beforehand, he should have still filed something or made it to the court, made a record of it, number one. Number two, he could have called the GAO as what? As a witness to inquire or get explanations. It wasn't done. You know, this is the GAO that's been on this case for a few years. This is an attorney who's been at GAO for hundreds of cases, okay, that the court relies upon. I don't, was the report filed at Tad's party? Yeah, I agree with that. And, but at the same time, the judge, on his own, well, we actually, both counsels, we agreed to do it. But it was, his ruling was vacated. He said, give me your arguments. Give me something that maybe I didn't see. So he corrected whatever issue I believe might have been out there, allowed arguments to be made, considered it, and rendered his same opinion. But he took the consideration of vacating it. So whatever error, minor error, may or may not, I don't think there was an error, but whatever minor error there was, it was corrected on its own. You know, and contrary to the appellant, there are several things I bring in my brief that I really dispute as far as allegations. One is there absolutely is no evidence that the minor child missed a doctor's appointment because of a car issue, period. I don't see that in the transcript. I was at trial. I don't remember that. She lives in a fourplex in Cambria, a park across the street. At the end of the day, what this case is all about is what the Fifth District has held in Houston, F-U-E-S-T-I-N-G, as this court is very familiar with. There's a presumption of the present custody arrangement based upon fatality of the circumstances of this trial. That's exactly what happened. This child, even the appellant agreed, is doing wonderful, wonderful, straight A, great grades, well-behaved, well-adjusted, comes to school, clean hygiene, no evidence. In fact, the trial court talked about that. You're not giving me any. Towards the end, it said, I'm going to get this straight. I said, now, I don't have any evidence of a child being malnourished, malfed, not adjusted, whatever. Basically, I'm just telling you, Attorney Trump, so far, this is what you've presented with me. The first grade teacher, Allison Cook, testified from Hartville. When he came to class, I'd been teaching, I think she said, seven years. He was one of the most well-prepared students that had ever come to my classroom. He had all his books. He had all his papers. He was prepared. He was ready to learn. She said he was a joy to be with. He was well-behaved. He was a little shy at first, like most people, but he adjusted well. He acted appropriately, interacted with her. In fact, that's really the case. He's done great in school. He has friends at school. He has friends at his apartment complex. In fact, the Heron teacher, when he was in kindergarten, said, Mother, you have a very polite child. You're doing very well. So that's this case. There's no evidence that whatever the mother's conduct may or may not be has not affected the child in any adverse way at all. In fact, what we have about this case, unfortunately, is a father who admittedly, although he's an LPN, diagnosed his child, did not take him to baseball because of being hot or wheezy, but never followed up with a doctor, didn't even know the primary doctor's name, didn't know any teacher's name from the fall of 2011, nor any teacher that he went to kindergarten with. And this is a father who wants to be engaged. This is the same father that the mother, a Cub Scout, entry form came down. He gave it to his son and said, Hey, go talk to your dad about taking you to Cub Scouts. Even though the father admitted deposition in trial, that Cub Scout, yes, would be good for him in a fine institution. He said, it's too far to drive from Marion to Goreville, 12 to 15 miles. And the cost of gas is too much. So you want to talk about the best interest standard in this case, 602? Clearly, the judge Berthia, who heard that type of evidence, said, I've got a child who's doing great. Yeah, maybe a mother can do a little bit better on some things, but I've got a child who's done great. No evidence of adverse effect at all. At the same time, I've got a father who won't even take his kids to Cub Scouts, who admittedly never took him to the Marion swimming pool, never took him to the Williamson County Fair, Holiday World, nothing. Didn't even take him fishing that summer. But this is a father who wants to be engaged with his child. Now, this is a control issue. I've dealt with this case now for about four years. And that's what this case is all about, unfortunately. We've got a mother who actually is making more income now than she was at the time of this divorce was granted. So in all due respect, he has siblings that he's with at the house, strong relationship. His sister testified. The mother has been the primary caretaker for this child. There absolutely is no silver bullet in this case whatsoever to suggest otherwise. So, you know, other than that, I just want to respect, as far as some of the arguments that were made, I'm pleased there wasn't an evidentiary issue at all. I think if this Court takes all the evidence in totem, realize that the ruling of this Court is on point and is not contrary to the evidence whatsoever. I think for the most part, that covers the case, cases. And before this Court, you know, in addition, the father of two years of schooling never attended a parent-teacher conference. You know, Alison Cooke, who testified for Tricy, said that he came, the mother was engaged, followed up on advance, came to the dances or the February party, things of that nature. A very involved mother. And a father, quite frankly, who's not. Who's not been involved in the last couple of years. But I think at the end of the day, when a father says, I'm not going to take my son to baseball because of a heat issue or because I think self-diagnosis of wheezing. Yet, as an LPN, like the judge asked now, are you an LPN or RN? You don't do diagnoses anymore. But never took him, it was so severe that he wouldn't take his son to baseball. But he wouldn't go to the doctor to confirm and follow up on, you know, his diagnosis. In fact, he didn't even follow up with the doctor on his own medications that evidence was supposed to have been on. You know, he talked about how it was supposed to be on this asthma medication. Never one time admitted at trial did he follow up with the doctor on this supposed medication issue that is being made here today. Nothing further. Thank you for your time. Counsel? I'll be brief. With respect to the factors, it's true there's no citations as to the judge making an incorrect finding of fact because there are no written findings of fact. So no, I cannot cite those. That's the exact reason I'm trying to say to the court that there should have been discussion of the findings of fact in the statutory analysis. We're not trying to re-litigate. I think that may be the misperception of appellee. I'm trying to say that the evidentiary rules should apply notwithstanding the statutory framework that recognizes the importance of having some continuity for a child. Notwithstanding that, the rules of evidence should not be undercut even in this kind of case. With respect to the Guardian Ad Libra report and I'll just say, it's kind of like when you get a... My family is from here. When you get a phone call that your cattle are on Interstate 57, that's a phone call you can't undo. You can't un-ring a bell. And with all due respect to a judge I've known since 1981, once you make your decision, I think it's difficult to undo that. Now, that is not the most important issue before this court. But it is one of the most important issues. I think what is important to address in this brief time are the distractions, the opportunities that have been offered to you to be distracted from the real issues. For example, the fact that appellate did not go to parent-teacher conferences. There was an OP entered soon after the post-judgment petition, I believe April of 11, that said he couldn't communicate or go to the school. The mother had sole custody. How did he have authority to take a child for a non-emergent treatment just to get another diagnosis? All of those things are great things to say if you have a nuclear family and you say, the dad's just sitting at home and not doing it. But when you have this kind of a case where there are orders establishing who has the authority, sometimes the sole authority, to do things for a child, you cannot then criticize the other parent for not doing it. Now, as to the asthma issue, if one reads the transcript, one sees that the father was saying, I didn't have an inhaler. I used to have an inhaler. I believed he had asthma. I could listen with a stethoscope, although he called it by the other name, and hear wheezing. I didn't know what to do. I didn't have access to the doctor, so no, I didn't take him. That's not being a bad parent. That's not failing to bond. And finally, I will comment that it was said that there's nothing in the record that doesn't indicate that on pages 19 to 20 of my brief and my statement of facts, I reference the June 14, 2012, transcript, page 95, lines 3 to 4, where that, in fact, was the testimony. Yes, thus interest is always the bottom line, but in this case, we had enough that was raised in the emergency post-judgment petition filed just a few months after the election that the court, as recommended by the guardian ad litem, said we need to pursue this. By the time trial came, more than 24 months had elapsed, so we now had the two years. I don't know why the delay. I wasn't there. I don't know why trial counsel filed a motion to amend pleadings in the midst of trial. I don't know those things, but the central focus, I believe, is whether the risk of harm was properly assessed, since we can't see findings of fact, and whether the testimony was unfairly limited by limiting rules of evidence to conform to the statute instead of letting the rules of evidence float independently to try to prove the significance of conduct occurring after August of 2010. I thank you for your time. Thank you. We appreciate the briefs and arguments of counsel to take the case under advisement.